# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *In re* | Chapter 11 |
| WORLD MARKETING CHICAGO, LLC, *et al.*,[1] | Case No. 15-32968 |
| | (Jointly Administered) |
| Debtors. | Honorable Timothy A. Barnes |
| | Hearing: December 9, 2015 at 10:00 a.m. |

### NOTICE OF MOTION

*Please take notice* that on **December 9, 2015** at **10:00 a.m.** or as soon thereafter as counsel may be heard, we will appear before the Honorable Timothy A. Barnes, United States Bankruptcy Judge, or any other judge sitting in his stead, in Courtroom 744 of the Dirksen Federal Building, 219 S. Dearborn Street, Chicago, Illinois and then and there present the attached *Motion Appoint a Chapter 11 Trustee*, at which time and place you may appear as you see fit.

*The Official Committee of Unsecured Creditors of World Marketing Chicago, LLC, et al.*

By: /s/ Jonathan P. Friedland
    One of Its Attorneys
Jonathan P. Friedland, Esq. (6257902)
Michael A. Brandess, Esq. (6299158)
**SUGAR FELSENTHAL GRAIS & HAMMER LLP**
30 N. LaSalle St., Ste. 3000
Chicago, Illinois 60602
Telephone:  312.704.9400
Facsimile:   312.372.7951

---

[1] The Debtors in these cases are World Marketing Chicago, LLC; World Marketing Atlanta, LLC; and World Marketing Dallas, LLC.

### CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 1, 2015, a true and correct copy of the *Motion to Appoint a Chapter 11 Trustee* was served via the Court's CM/ECF system upon all registered counsel and parties of record and on December 2, 2015 on the attached Service List.

Date: December 1, 2015                             By:  /s/  Jonathan P. Friedland

### Service List

*Via First Class U.S. Mail*

| | |
|---|---|
| Crane Heyman Simon Welch & Clar<br>Attn: Jeffrey Dan, Brian Welch and David Welch<br>135 S Lasalle St Ste 3705<br>Chicago, IL 60603 | Kathryn Gleason<br>Office of the U.S. Trustee, Region 11<br>219 S Dearborn St., Room 873<br>Chicago, IL 60604 |
| Katten Muchin Rosenman, LLP<br>Attn: John P. Sieger and Paul T. Musser<br>525 W. Monroe St.<br>Chicago, IL 60661 | Stromberg Stock, PLLC<br>Attn: Mark Stromberg<br>8750 N. Central Expy., Ste. 625<br>Dallas, TX 75231 |
| Kirkland & Ellis LLP<br>Attn: Ryan P. Dahl and Devon M. Largio<br>300 N. LaSalle<br>Chicago, IL 60654 | Olstein Law LLC<br>Attn: Joseph M. Olstein<br>10450 S. Western Ave.<br>Chicago, IL 60643 |
| Baker Botts L.L.P.<br>James R. Prince<br>2001 Ross Avenue<br>Dallas, TX 75201 | Latimer LeVay Fyock LLC<br>Attn: Sheryl A. Fyock and Tejal S. Desai<br>55 West Monroe St., Ste. 1100<br>Chicago, Illinois 60603 |
| Reed Smith, LLP<br>Aaron B. Chapin<br>10 S. Wacker, 40th Fl.<br>Chicago, IL 60606 | Haynes and Boone, LLP<br>Attn: Jarom J. Yates and Autum D. Highsmith<br>2323 Victory Ave., Ste. 700<br>Dallas, TX 75219 |
| Shaw Fishman Glantz & Towbin, LLC<br>Attn: John W. Guzzardo<br>321 N. Clark St., Ste. 800<br>Chicago, IL 60654 | Seyfarth Shaw LLP<br>Attn: Marianne Dickson<br>560 Mission Street 31st Floor<br>San Francisco, CA 94105-2930 |
| Golan & Christie, LLP<br>Attn: Barbara L. Yong<br>70 W. Madison St., Ste. 1500<br>Chicago, IL 60602 | Seyfarth Shaw LLP<br>Attn: Jason J. DeJonker<br>131 S. Dearborn St., Ste. 2400<br>Chicago, IL 60603 |
| Nigro, Westfall & Gryska, P.C.<br>Attn: Craig C. Westfall<br>1793 Bloomingdale Road<br>Glendale Hts., IL 60139 | |

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *In re* <br><br> WORLD MARKETING <br> CHICAGO, LLC, *et al.*,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 15-32968 <br><br> (Jointly Administered) <br><br> Honorable Timothy A. Barnes <br><br> Hearing:  December 9, 2015 at 10:00 a.m. |

### MOTION TO APPOINT A CHAPTER 11 TRUSTEE

The Official Committee of Unsecured Creditors ("*Committee*") of World Marketing Chicago, LLC, *et. al.* ("*Debtors*") files this motion (the "*Motion*") to appoint a chapter 11 trustee ("*Bankruptcy Code*").  In support of the Motion, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT

1. A motion to appoint a Chapter 11 Trustee pursuant to Bankruptcy Code §1104(a) must be granted when a bankruptcy court finds there is cause to do so *or* when doing so is in the best interests of creditors and other interest holders.

2. This Motion meets both standards for at least the following reasons:

   - Debtors failed to disclose that post-petition funds were being used to employ an insider entity.

   - Debtors failed to investigate—and cannot be expected to—an obvious potential cause of action against an insider.

   - Debtors are not operating yet continue to accrue unnecessary expenditures at an alarming rate and are generally permitting their cases to languish.

---

[1]  The Debtors in these cases are World Marketing Chicago, LLC; World Marketing Atlanta, LLC; and World Marketing Dallas, LLC.

3. The need for this Motion has become more and more obvious in just the past several days, necessitating the decision to work over the Holiday Weekend in order to file it as quickly as possible. As explained in more detail below:

- Debtors' sale motion [Dkt. #52], which contemplated a going concern buyer, had clear deficiencies (which were pointed out in objections filed by the Committee [Dkt. #83], American Airlines, Inc. [Dkt. #95], Associated Bank, National Association (the "*Bank*") [Dkt. #110] and MM Industrial Stoneridge, Inc. [Dkt. #117]), none of which the Debtors responded to.

- Instead, Debtors advised the Committee repeatedly stated that offers would be received by HyperAMS and PPL Group (it should be pointed out that both parties are clients of Committee counsel and, upon information and belief, both parties were brought to the table totally or in large part by the efforts of Committee counsel).[2] *See* Declaration of Michael Brandess ("*Brandess Declaration*") at par. 4, attached hereto as **Exhibit A.**

- Recognizing that the continuing burn of Debtors' leases and utilities was approximately $250,000 per month, that the two bidders at hand would likely require at least two months of occupancy, and that their respective bids were likely be no more than about $1 million, the Committee urged Debtors on November 25, 2015 to file a supplement to the sale motion to help put the Court in a position to be able to properly consider and approve a sale at the December 2, 2015 hearing. *See* Brandess Declaration at par. 9; *see* also par. 36 and 40 below. Debtors have done nothing in response as of the date of the filing of this Motion.

- PPL's submitted its bid on November 27th, copying the Committee. *See* Brandess Declaration at par. 8. Upon review, it was clear it was not a bid but, rather, an expression of interest. Notably, it was made contingent on the preparation of a mutually agreed-upon asset list and definitive agreement. The Committee believes the reason the PPL bid is not more certain is due to Debtors' unwillingness or inability to communicate on a timely basis, rather than due to any deficiency in PPL's process.

- HyperAMS submitted a bid on November 15, 2015. *See* Brandess Declaration at par. 6. As recently as November 27, the Committee was advised by the Debtors that no such bid had been submitted. *See* Brandess Declaration at par. 7(a).

---

[2] SFGH intends to supplement its declaration in support of retention to disclose its relationship with HyperAMS and PPL Group.

2

4.      Figuratively speaking, nobody appears to be manning the wheel. If someone is in charge, it certainly is not clear who that is because the Debtors have been opaque in their dealings with the Committee and because basic questions either have gone unanswered or have been answered incorrectly. *See* Brandess Declaration at par. 3; *see also* Bank's Objection to Use of Cash Collateral [Dkt. # 118] at par. 9 ("Debtors' have provided little in the way of updates on the progress of their sale efforts.").

5.      The Committee is still uncovering significant and troubling issues with basic case administration. When compounded with the many clear insider issues and undisputable continued cash burn, the necessity of the relief is clear. Without a Chapter 11 Trustee, the Debtors' estates will continue to diminish in value at an alarming pace.

6.      Further, based on information learned on November 29, 2015, it appears that there is a direct and irrefutable conflict between the Robert W. Kraft, the person who ultimately controls the Debtors, and the Debtors. As explained in paragraphs 56-60, an entity he controls is a prime litigation target by the Debtors. Obviously, for this reason alone, he cannot be permitted to stay in control of the Debtors.

7.      For the reasons summarized above and amplified upon below, the immediate appointment of a Chapter 11 trustee is necessary to protect the best interests of all parties.

### JURISDICTION AND VENUE

8.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper before this Court pursuant to 28 U.S.C. § 1409(a).

### LEGAL STANDARD

9. Under Bankruptcy Code §1104(a)(1), "the court shall order the appointment of a trustee—for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management."

10. Alternatively, Bankruptcy Code §1104(a)(2) provides that "the court shall order the appointment of a trustee—if such appointment is in the interests of creditors . . . and other interest of the estate."

### FACTUAL RECORD ESTABLISHING NEED FOR TRUSTEE

11. Robert W. Kraft ("*Father*") is the president of Blue Streak Holdings, Inc. ("*Blue Streak*"). *See* Section 341 Meeting Transcript, attached hereto as **Exhibit B** ("*Transcript*"), at lines 13-16; 79-84.

12. Until Father fired him shortly before Debtors filed bankruptcy on September 28, 2015 ("*Petition Date*"), his son Robert M. Kraft ("*Son*") was president of Blue Streak. *See* Transcript at lines 90-103.

13. Blue Streak, in turn, is the manager of World Marketing Holdings, LLC ("*Holdings*"). *See* Transcript at lines 79-89.

14. Holdings owns 100% of the Debtors. *See* [Dkt. #1].

**A. Debtors failed to disclose that post-petition funds were being used to employ an insider-owned entity**

15. Debtors have been using cash pursuant to a budget that was approved as part of the interim cash collateral order granted on October 7, 2015 [Dkt. #25], and as amended by Court order granted on October 21, 2015 [Dkt. #48]. A final cash collateral order was granted on November 3, 2015 [Dkt. #81]. One of the more significant expenses included in the budget were payments to RWK Global Holdings ("*RWK Global*") in the amount of $20,000 through

4

December 2, 2015, with an additional $20,000 in the proposed cash collateral budget through January 2015.

16.     *Nowhere* in the record did Debtors disclose that RWK Global is an entity wholly owned by Father.

17.     Under questioning at Debtors' continued 341 meeting, Father admitted that he is the sole owner of RWK Holdings.  *See* Transcript at lines 224-243.

18.     The Debtors failed to disclose that insider connection when it filed its motion to obtain permission to use cash [Dkt #4] and attached a budget pursuant to which such payments are made.

19.     In addition to being a clear breach of the Debtors' disclosure obligations, the existence of this failure to disclose raises the specter of other potential insider undisclosed relationships.

**B. Debtors' have failed to investigate an obvious potential cause of action against an insider**

20.      Associated Bank, National Association ("*Bank*") loaned Holdings $6 million ("*Loan*") about a year before the Petition Date. *See* Complaint for Breach of Note and Credit Agreement, Breach of Guaranty, and Fraud attached hereto as **Exhibit C** ("*Fraud Complaint*").

21.     Each of Blue Streak, Father, Son, and Debtors are co-guarantors on the Loan.  *See* Fraud Complaint.

22.     Bank sued Holdings, Blue Streak, Father and Son on October 7, 2015 in the Circuit Court of Milwaukee County, Wisconsin.  *See* Fraud Complaint.  Bank's allegations include that:

- Holdings, Blue Streak, and Son made material financial misrepresentations to the Bank in procuring the Loan.

- Son authorized distributions in the amount of $1,165,000 to First Edge Solutions, Inc. ("*First Edge*").
- First Edge is an affiliate of Holdings.
- Son was chief executive officer of First Edge.

23. Under questioning at Debtors' continued 341 exam, Father admitted that Son was the majority owner of First Edge until its receivership was commenced. *See* Transcript at lines 127-131.

24. Father also admitted during the continued 341 exam that he was aware of the allegations and fired his son because of them. Yet Father also admitted he has done nothing to investigate whether Son acted wrongly. *See* Transcript at lines 145-154.

25. A father cannot be faulted for loving a son but neither can that father be relied upon to investigate and perhaps order that litigation be filed against his son.

26. In addition, Father just spearheaded the purchase of First Edge out of receivership, as described in more detail at paragraphs 56-60. Father's material involvement in the purchase clearly also makes it impossible for him to effectively oversee the investigation and pursuit of any viable claims the estates may have against First Edge.

C. **Debtors are not operating; continue to accrue unnecessary expenses at an alarming rate, are generally permitting their cases to languish; and the only parties who will be harmed are unsecured creditors.**

*Sale Efforts*

27. Debtors filed a sale motion on October 26, 2015 [Dkt. #52] which contemplated a sale to a stalking horse bidder. That would-be buyer walked away.[3]

---

[3] The walk-away appears to be a breach of the asset purchase agreement. The Debtors have not indicated any intent to pursue claims on such breach – in fact, the Committee has no comfort that the Debtors even recognized that a breach occurred until the Committee pointed it out.

6

28. Debtors have done virtually nothing else to sell their assets. On October 26, 2015, the date the sale motion was filed, the Committee reached out to HyperAMS and PPL Group, two regional liquidators, to ascertain their interest in the Debtors' assets. The Committee remained in contact with members from both firms throughout the sale process to promote the sale. *See* Brandess Declaration at par. 4.

29. The Committee's objected to the sale motion [Dkt. #83], raising a number of questions regarding the sale process, none of which were adequately addressed by Debtors.

30. One issue addressed in the Committee's objection pertained to the Debtors' failure to advertise the sale *anywhere*. The Committee suggested, at a minimum, that the deal be advertised for free on DailyDAC.com, a newsletter and website that lists opportinites to buy distressed assets and which is read by tens of thousands of people each week.[4] At the initial sale hearing on November 10, 2015, Debtors' counsel informed the Court that Debtors would place an advertisement on DailyDAC.com. For days, no action was taken. The Committee finally took it upon itself to place the listing on the deal-listing site in order to promote a robust auction. *See* Brandess Declaration at par. 5.

31. On November 15, 2015, HyperAMS informed the Committee that it had submitted a bid. *See* Brandess Declaration at par. 6.

32. During the Debtors' continued 341 meeting the next day, the Debtors—curiously—informed the Committee that no liquidator bids had been submitted (*See* Transcript at lines 185-188).

33. Several days later, the Debtors finally circulated the draft APA submitted by HyperAMS. However, as noted in paragraph 3 above, on November 27, 2015, Kevin Seiberlich

---

[4] DailyDac.com is owned by one of the Committee's professionals. This was previously disclosed in the Committee's objection to the sale motion.

7

of Optimus informed the Committee that he did *not* have the bid.  *See* Brandess Declaration at par. 8(b).

34.     On November 27, 2015, PPL submitted a bid for the Debtors' assets.  However, the bid was clearly deficient because, as noted in paragraph 3 above, the bid was made conditioned on a mutually agreeable asset list and either an Asset Purchase Agreement or a guaranty agreement.  Neither the asset list nor the definitive agreement were submitted along with the bid.  *See* Brandess Declaration at par. 8.  As stated in paragraph 3, above, the clear reason for the bid's deficiency is Debtors' lack of communication with PPL.

35.     Throughout these Cases, the Debtors have stressed the need for a prompt liquidation to prevent the run up of administrative costs (*see* Sale Motion [Dkt. #52] (where Debtors sought to sell to the stalking horse on shortened notice)) and have assured the Committee that Debtors would be prepared to consummate a sale, either to the stalking horse or to a back-up bidder on December 2, 2015.

36.     Even if the Debtors were otherwise prepared to move forward with the sale on December 2, 2015, the sale motion, as drafted, does not contemplate the sale of assets to a party other than the stalking horse.  *See* sale motion [Dkt. #52].  As referenced in paragraph 3 above, on November 25, 2015, the Committee requested that the Debtors amend the sale motion to remedy this, but received no response.  *See* Brandess Declaration at par. 9.

*Cash Burn- Rent*

37.     Despite ceasing new business-related operations, the Debtors' continue to spend considerable amounts on rent and utilities, including:

| Facility | Monthly Rent and Utilities |
|---|---|
| Chicago | $92,970.00 |
| Atlanta | $49,102.00 |
| Dallas | $104,738.00 |
| Total | $246,810.00 |

*See* 9/28/15 – 11/30/15 Cash Collateral Budget [Dkt. #81].

38. The bids submitted by HyperAMS and PPL were conditioned on being able to conduct sales at the leased facilities, thus necessitated access to the facilities for a significant amount of time following the sale. This is the figurative melting ice cube that case law speaks about, yet the Debtors are moving at a snail's pace.

39. Why might this be? At a minimum, the Committee intends to investigate whether there are any undisclosed relationships between Debtors and landlords.

40. Regardless, the carrying costs are considerable.

41. The only legitimate reason Debtors have to continue paying rent is so that their equipment can be sold in place by a liquidator. Debtors ceased taking new engagements as of the Petition Date, have fulfilled all outstanding engagements, and are no longer operating as a going concern. *See* Transcript at lines 214-217.

*Cash Burn- People*

42. When asked at the continued 341 meeting (on November 16th), Father did not know how many employees Debtors still had on payroll. Debtors' counsel filled in the blanks, stating that the number was about 22 people. *See* Transcript at lines 302-309.

43. When prompted further, Debtors' counsel provided an ambiguous overview of the employees' current responsibilities. At various points Debtors' counsel interjected when Father was not responsive. Yet, he too stated that he was just "guessing" what employees were actually

9

doing. He noted that while the employees were "still doing work," the Debtors were not doing mailings or bringing in new business. *See* Transcript at lines 312-338.

44. During a telephone conference on November 24, 2015, Debtors' counsel informed the Committee that many of the remaining employees were responsible for maintaining the Debtors' machinery, preventing theft or cleaning the Debtors' warehouse and recycling pallets. The Committee requested that the Debtors look to further pair down staffing. *See* Brandess Declaration at par. 10.

*Lack of Knowledge*

45. Father testified at the continued 341 meeting the he is the manager of Blue Streak, the entity that placed the Debtors in bankruptcy. *See* Transcript at line 14. However, Father could not answer numerous basic questions about the Debtors, such as the following:

- whether Holdings, the Debtors' parent company, had any business operations of its own aside from the Debtors;
- whether Kevin Seiberlich has been directly involved in the Debtors' operations;
- whether Holdings transferred over $1 million to First Edge, a marketing and printing entity previously owned and controlled by Son (which, as of November 24th, is owned at least in part by an entity owned by Father);
- whether any bids had been received from any liquidators; and
- why Holdings has a claim in the Debtors' Cases

*See* Transcript at lines 141-144, 157-161, 185-187, 271-274, 349-351

46. In fact, based on Father's testimony, he is unaware of who is overseeing the Debtors' operations. At one point during the continued 341 meeting, Father testified, "I'm really relying on Kevin Seiberlich and his assistants in place to manage this thing down." *See* Transcript at lines 343-344. However, directly thereafter, Debtor's counsel noted, "Mr. Kraft doesn't deal with the day to day operations. That's Mr. Jeffcoat." *Id.* at 358; *see also* Transcript

10

at line 292 ("Ok, and [Jeffcoat] continues to serve as president of each of the three Debtors and COO").

47.    In either case, Father testified, "when we were going through the initial stages, I talked to [Jeffcoat] maybe once a week but it hasn't been that frequently because I have been traveling." *See* Transcript at lines 297-301. Likewise, when prompted about his contact with Optimus, Father testified "I've been out of the country for almost two weeks. I talked to Kevin last week briefly, and it was just a two minute conversation. Nothing consequential. How are you doing. That was it." *See* Transcript at lines 182-184.

48.    As the Debtors' representative who had signed the Debtors' Schedules and Statements of Financial Affairs, Father testified that he had reviewed each of the Schedules and Statements and had instructed his counsel to file them. *See* Transcript at lines13-58.

49.    The Committee asked if payments had been made to officers during the 90 days before bankruptcy, and Father testified that no payments had been made. *See* Transcript at lines 269-270. This runs counter to World Marketing Atlanta's Statement of Financial Affairs 3(c), which references payments made to Tyrone Jeffcoat. [Dkt. #61-1].

50.    Father also testified that no payments were made to insiders during the year before the bankruptcy filings, but Debtors' counsel had to correct Father by stating that officers had been paid during that time period. *See* Transcript at lines 260-268.

51.    Additionally, the Debtors' Schedules, as initially filed, were rife with patent omissions. [Dkts. # 54, 68 and 61]. For instance, the Debtors Schedules made no reference to any co-debtors. Schedule H was amended to reflect this oversight. [Dkts. # 72-74]. Likewise, the Debtors' Statements of Financial Affairs failed to include transfers to insiders, which the Debtors still have yet to remedy.

11

52. The Debtors have also failed to disclose necessary information regarding payments to insiders. At the continued 341 meeting, the Committee noted that section 3(c) of the each of the Debtors' Statements of Financial Affairs ("*SOFA*") indicated that no payments had been made to insiders in the year before the Petition Date. Debtors' counsel answered that payments had been made to officers and that section 3(c) would be amended. No amendments have been made to date. *See* Transcript at lines 260-268.

53. Finally, the budget attached to the final cash collateral order provides for the payment of $10,002 to JRM Advisors, a public relations firm. [Dkt. #81]. The retention of a PR firm in a Chapter 11 case of this size is unusual, to say the least. Given the direction of the case from the very first day, it is even harder to understand why a PR firm would be needed. We do know, however, that JRM has done work for other entities owned by Father. *See* Transcript at lines 244-259. We also know that JRM is owned by Joshua J. Morby, who, during the Chapter 11 Cases, acted as spokesman for RWWF LLC, the entity that just purchased the assets of First Edge out of receivership. See http://www.biztimes.com/2015/10/14/robert-kraft-led-company-plans-to-buy-first-edge-solutions-out-of-receivership/. More on this below.

*Lack of Transparency*

54. The Committee has made numerous basic information requests on the Debtors, such as those pertaining to the Debtors' sale and marketing efforts. Some requests have simply been ignored, other are responded to after substantial delay. *See* Brandess Declaration at par. 3.

55. As of this Motion, the Committee is even largely unclear on the Debtors' current operational structure and the Debtors have stymied the Committee's attempts to speak with Tyrone Jeffcoat.

12

56. Another datapoint, discovered just days ago by the Committee, demonstrates the lack of transparency and level of conflict: RWWF LLC, a firm controlled by Father, purchased the assets of First Edge on November 24th.[5] *See* http://www.bizjournals.com/milwaukee/news/2015/11/24/bob-kraft-led-firm-buys-sons-first-edge-solutions.html.

57. Paragraphs 22-24, above, describe how Father was questioned about the Debtors' transactions with First Edge at the continued 341 meeting. Father was specifically asked why he did not investigate these transactions. Father's decision to remain silent about his then-pending transaction to buy First Edge is telling, to say the least.

58. First Edge[6] was—and RWWF LLC now is—clearly a litigation target. Thus, the Court must ask itself not only whether Father can reasonably be expected to investigate Son; it must ask whether Father can be reasonably expected to investigate himself.

59. The Committee believes that an investigation into Father and Son, and their various entities, will become a principle activity in these bankruptcy cases.

60. Perhaps it is for this reason that the Debtors have been opaque and not forthcoming. In any event, this is exactly what the Debtors have been. *See* Brandess Declaration at par. 3.

## LEGAL AUTHORITY

61. If this Court determines "cause" exists under section 1104(a) of the Bankruptcy Code, then appointment of a chapter 11 trustee is mandatory. *See, e.g., In re Modern Metal*

---

[5] RWWF "is a creature of a fund created to invest the money of wealthy foreign nationals in the U.S. in exchange for permanent residency status." *See* http://www.jsonline.com/business/president-of-bankrupt-company-seeks-financing-to-buy-sons-company-out-of-receivership-b99595662z1-332416492.html.

[6] First Edge "was the offshoot of another Kraft business that filed for receivership. In late 2002, an eight-year-old print-shop company called RWK Enterprises Inc. went into receivership. Both Bob and Bobby Kraft were principals of RWK. Bob Kraft was by far the firm's biggest creditor." *See* http://www.jsonline.com/business/president-of-bankrupt-company-seeks-financing-to-buy-sons-company-out-of-receivership-b99595662z1-332416492.html.

*Prods. Co.*, 422 B.R. 118, 125 n.4 (Bankr. N.D. Ill. 2009); *In re Ontario Entm't Corp.*, 237 B.R. 460, 472 (Bankr. N.D. Ill. 1999); *see also* 11 U.S.C. § 1104(a)(1). Similarly, this Court must appoint a chapter 11 trustee if "such appointment is in the interests of creditors." 11 U.S.C. § 1104(a)(2).

**I.    Cause exists to appoint a chapter 11 trustee under section 1104(a)(1)**

62.    Section 1104(a)(1) of the Bankruptcy Code contains a list of what constitutes cause for purposes of appointment of a chapter 11 trustee: fraud, dishonesty, incompetence, or gross mismanagement of the debtor's affairs by current management, either before or after the commencement of the case. 11 U.S.C. § 1104(a)(1). However, this list is not exclusive.[7] For example, a lack of confidence in the debtor's current management, acrimony between management and creditors, and an inability for the debtor to discharge its fiduciary duties as debtor-in-possession may all constitute cause for appointment of a chapter 11 trustee.[8]

63.    Additionally, "[t]he appointment of a trustee under § 1104(a)(1) is appropriate where the debtor has diverted funds or failed to explain the diversion of funds. A history of transactions between the debtor and related companies can serve as cause for the appointment of a trustee under § 1104(a)(1), as can the debtor's failure to keep adequate records and to make prompt and complete reports."[9] Accordingly, a determination of cause is within the discretion of the court and due consideration must be given to the various interests involved in the bankruptcy proceeding. *Bellevue Place*, 171 B.R at 623.

---

[7]    *E.g., In re Madison Mgmt. Grp., Inc.*, 137 B.R. 275, 281 (Bankr. N.D. Ill. 1992).

[8]    *Id.*; *Bellevue Place*, 171 B.R. 615, 623; *In re SRJ Enters.*, 151 B.R. 189, 194-95 (Bankr. N.D. Ill. 1993).

[9]    *Crescive Landscape Mgmt. v. PHDC, LLC (In re PHDC, LLC),* 2004 Bankr. LEXIS 1113 (Bankr. N.D. Ga. Apr. 28, 2004) (internal citations omitted).

14

## II. Appointment of a chapter 11 trustee is in the best interests of creditors.

64. Even if this Court finds that no cause exists to appoint a chapter 11 trustee under section 1104(a)(1) of the Bankruptcy Code, it must also appoint a trustee if the appointment is in the best interest of creditors. 11 U.S.C. § 1104(a)(2).

65. Section 1104(a)(2) provides a flexible standard for appointment of a trustee, affording courts wide discretion on the matter. *Bellevue Place*, 171 B.R. at 623. This section of the Bankruptcy Code allows courts to look at the practical realities and necessities to appoint a chapter 11 trustee.[10]

66. Among the factors courts consider under section 1104(a)(2) are: (i) the trustworthiness of the debtor; (ii) the debtor's current management's past and present performance; (iii) prospects for the debtor's rehabilitation; (iv) the confidence – if any – of the creditors in the debtor's current management; and (v) the benefits derived by appointment of a trustee versus the cost of appointment. *Id.*

67. Courts in the Northern District of Illinois have held that if a party "can demonstrate substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, the Court must order the appointment of a trustee."[11] Where the current management continues to burden the debtor's estate, further delaying appointment of a chapter 11 trustee would jeopardize the interests of creditors and the estate.[12]

---

[10]  *Madison Management*, 137 B.R. at 282 (citing *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).

[11]  *E.g., In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009).

[12]  *See In re Seeburg Prods. Corp.*, 215 B.R. 175, 181 n.16 (Bankr. N.D. Ill. 1997).

15

68. Likewise, where the debtor's management engaged in acts that caused harm to the debtor's estate, then appointment of a trustee was in the best interests of creditors.[13] In fact, courts generally hold that the only way to avoid further mismanagement of the debtor's affairs is to appoint a chapter 11 trustee. *See, id.* Additionally, courts find that the appointment of a trustee is in the best interests of creditors when the debtor's management engages in "questionable" business practices.[14]

69. The facts in this case cry out for the appointment of a chapter 11 trustee.

### REQUEST TO APPOINT PHILLIP VAN WINKLE AS CHAPTER 11 TRUSTEE

70. For the reasons stated above, the Committee has concluded that the immediate appointment of a Chapter 11 Trustee is imperative.

71. The Committee will request that the United States Trustee appoint of Phillip Van Winkle of AEG Partners as Chapter 11 Trustee under Bankruptcy Code. As the Committee's proposed financial advisor, Mr. Van Winkle is disinterested and has a requisite knowledge of the material facts and the ability to address the many deficiencies currently diminishing value in these Cases. Further, the Committee's selection of Mr. Van Winkle was made after interviewing three additionally highly qualified turnaround and financial firms.

*WHEREFORE*, for the reasons set forth herein, the Committee respectfully requests that this Court enter an order, in the form attached hereto, approving the Motion and granting such other and further relief as this Court deems just and proper.

---

[13] *See, e.g., N. Am. Commc'ns, Inc.*, 138 B.R. 175, 178 (Bankr. W.D. Pa. 1992); *In re Great Ne. Lumber & Millwork Corp.*, 20 B.R. 610, 611 (Bankr. E.D. Pa. 1982); *In re United Church of the Ministers of God*, 74 B.R. 271, 279 (Bankr. E.D. Pa. 1987).

[14] *See, e.g., In re Rivermeadows Assocs.*, 185 B.R. 615, 617 (Bankr. D. Wyo. 1995).

| | |
|---|---|
| Dated: December 1, 2015 | Respectfully submitted,<br><br>*The Official Committee of Unsecured Creditors of World Marketing Chicago, LLC, et al.*<br><br>By: /s/ Jonathan P. Friedland<br>One of Its Attorneys<br><br>Jonathan P. Friedland, Esq. (6257902)<br>Michael A. Brandess, Esq. (6299158)<br>SUGAR FELSENTHAL GRAIS & HAMMER LLP<br>30 N. LaSalle St., Ste. 3000<br>Chicago, Illinois 60602<br>Telephone: 312.704.9400<br>Facsimile: 312.372.7951<br>jfriedland@SugarFGH.com<br>mbrandess@SugarFGH.com |